**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| TUYET VU, derivatively on behalf of LOANDEPOT, INC., | |
| Plaintiff, | **C.A. No. _____** |
| vs. | |
| ANTHONY HSIEH, PATRICK FLANAGAN, NICOLE CARRILLO, ANDREW C. DODSON, JOHN C. DORMAN, BRIAN P. GOLSON, and DAWN LEPORE, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| LOANDEPOT, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Tuyet Vu ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant loanDepot, Inc. ("LDI" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Anthony Hsieh ("Hsieh"), Patrick Flanagan ("Flanagan"), Nicole Carrillo ("Carrillo"), Andrew C. Dodson ("Dodson"), John C. Dorman ("Dorman"), Brian P. Golson ("Golson"), and Dawn Lepore ("Lepore") (collectively, the "Individual Defendants," and together with LDI, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of LDI, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Section 11(f) of the

Securities Act of 1933 (the "Securities Act") and Section 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding LDI, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by LDI's directors and officers from February 11, 2021 through August 3, 2021 (the "Relevant Period") based on misleading statements and omissions made in connection with and following the Company's February 2021 initial public offering of stock (the "IPO").

2.      LDI was incorporated in Delaware on November 6, 2020 to facilitate the IPO of LD Holdings Group, LLC ("LD Holdings") and its consolidated subsidiaries, which include loanDepot.com, LLC ("LDLLC, and together with LD Holdings and the Company, "LoanDepot"), Artemis Management, LLC ("ART"), LD Settlement Services, LLC ("LDSS"), and mello Holdings, LLC ("Mello"). The Individual Defendants all served as officers and/or directors at LDLLC prior to the incorporation of LDI.

3.      The Company describes itself as "a customer-centric, technology-empowered residential mortgage platform with a widely recognized consumer brand." Its sole material asset is

an equity interest in LD Holdings, which is a holding company the material assets of which are 100% equity interests in ART, LDSS, and Mello, and a 99.99% ownership interest in LDLLC, which Defendant Hsieh founded in 2009 and which is the Company's primary operational predecessor. The Company primarily derives revenue from gain on origination and sale of loans. In the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), LoanDepot had more than $4 billion in revenue from gain on origination and sale of loans, net, representing more than 93% of its revenues for that year.

4.     The Individual Defendants began taking steps to take the LDLLC public in late 2020. On November 6, 2020, LDI was incorporated. On November 12, 2020, the Company filed its draft registration statement on Form DRS (the "Draft Registration Statement"), which was subsequently amended on December 22, 2020. On January 11, 2021, the Company filed its registration statement on Form S-1 (the "Registration Statement"). The Registration was signed by Defendants Hsieh, Flanagan, and Carrillo and contained attachments signed by Defendants Dodson, Dorman, Golson, and Lepore consenting to being named as director nominees therein. After the Company amended the Registration Statement several times, the SEC declared the Registration Statement effective on February 10, 2021.

5.     The Company's common stock began trading on the New York Stock Exchange ("NYSE") on February 11, 2021, with shares being offered for sale by the Company and by Parthenon Capital, a private equity firm, and its affiliates (Parthenon Capital and its affiliates, the "Parthenon Stockholders"). The Company and the Parthenon Stockholders sold a total of 4,427,500 shares of Class A common stock in the IPO at a price of $14.00 per share. Through the IPO, and in light of the underwriters' exercise of the option to purchase additional shares, the Company raised net proceeds of $36.2 million, with the selling stockholders receiving proceeds of

approximately $22 million.

6.     On February 16, 2021, the Company filed its prospectus on Form 424B4 (the "Prospectus"), which formed a part of the Registration Statement (the Draft Registration Statement, the Registration Statement, and the Prospectus, together with applicable amendments, are collectively referred to as the "Offering Documents"). Also on February 16, 2021, the Company completed its IPO.

7.     In conjunction with the IPO and throughout the Relevant Period, the Individual Defendants made, or caused the Company to make, materially false and misleading statements concerning LDI's business, operations, and prospects. Specifically, the Company touted its customer recapture rates as well as growth in its originations, revenue, net income, and adjusted net income, describing itself as "one of the fastest-growing and most profitable companies in our industry."

8.     However, during the IPO and throughout the Relevant Period, the Individual Defendants failed to disclose that LoanDepot's refinance originations and margins had declined substantially at the time of the IPO and that, accordingly, LoanDepot's revenue and growth were negatively impacted. Furthermore, the Individual Defendants failed to disclose that LoanDepot's revenue and growth were artificially buoyed by overcharging of interest from at least 2016 to 2019 (the "Interest Overcharging") and by the closing of loans without proper documentation in the period preceding the IPO (the "Origination Conduct").

9.     The Individual Defendant's misrepresentations had the effect of misleading the investing public and artificially inflating the Company's stock at the time of the Company's IPO— in which the Company raised net proceeds of $36.2 million and in which the selling stockholders received net proceeds of approximately $22 million—and throughout the Relevant Period, during

which time one of the Individual Defendants benefitted from lucrative insider sales at artificially inflated prices for proceeds of approximately $164,595.

10.     The truth emerged on August 3, 2021, when the Company announced disappointing earnings for the second quarter of 2021.

11.     By August 17, 2021, the price per share of the Company's Class A common stock fell to $8.07, a decline of more than 42% from the IPO price of $14.00 per share.

12.     On September 21, 2021, LoanDepot's former Chief Operating Officer, Tamara "Tammy" Richards ("Richards") filed a complaint in California Superior Court, County of Orange, alleging ten causes of action, including retaliation for reporting illegal activities, discrimination because of sex, and unlawful business practices, captioned *Richards v. loanDepot, Inc. et al.*, Case No. 30-2021-01222421-CU-WT-CJC (Cal. Sup. Ct.) (the "California Complaint"). In the California Complaint, Richards alleged that, from between at least 2016 and 2019, LoanDepot, as well its subsidiary Closing USA, LLC ("CUSA") had engaged in the Interest Overcharging by charging loan refinance borrowers double daily interest during a period when CUSA had failed to timely pay off original loans but new loans had already been originated. Furthermore, Richards alleged in the California Complaint that the Defendant Hsieh directed individuals at LoanDepot to engage in the Origination Conduct by closing loans without documentation, and that such misconduct did in fact occur, in violation of numerous federal laws.

13.     The Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public, in conjunction with the Company's IPO and during the Relevant Period, a series of materially false and misleading statements regarding the Company's business, operations, and prospects that the Individual Defendants failed to correct throughout the Relevant Period. Specifically, the Individual Defendants willfully or

recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) LoanDepot had engaged in the Interest Overcharging and the Origination Conduct; (2) LoanDepot's refinance originations had declined significantly at the time of the IPO due to competition and industry saturation; (3) LoanDepot's gain-on-sale margins had declined substantially by the time of the IPO; (4) significantly lower growth and refinance originations had already forced the Company to embark on an expense reduction plan; (5) as a result of all the foregoing, the Company's revenue and growth would be negatively impacted; and (6) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

14.     Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

15.     Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

16.     Furthermore, during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Approximately 2,699,981 shares of the Company's Class C common stock were repurchased on February 19, 2021 at the IPO price per share of $14.00, for a total of approximately $37.8 million. As the Company's stock was actually only worth $8.07 per share during that time, the price at closing on August 17, 2021, the Company overpaid by approximately $21.8 million in total.

17.     In light of the Individual Defendants' misconduct—which has subjected the

Company and the Individual Defendants to two federal securities fraud class action lawsuits pending in the United States District Court for the Central District of California (the "Securities Class Actions") and which has further subjected the Company to the need to undertake intake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

18.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

19.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the Individual Defendants' liability in this derivative action and in the Securities Class Actions, of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

21.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Securities Act of 1933 (the "Securities Act").

22.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by conducting business in this District.

## PARTIES

### Plaintiff

25.     Plaintiff is a current shareholder of LDI. Plaintiff has continuously held LDI common stock at all relevant times.

### Nominal Defendant LDI

26.     LDI is a Delaware corporation with its principal executive offices at 26642 Towne Centre Drive, Foothill Ranch, California 92610. The Company's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "LDI."

### Defendant Hsieh

27.     Defendant Hsieh founded LDLLC in 2009 and has served as its Chairman and CEO since that time. In addition, he has served as the Company's Chairman and CEO since its formation in November 2020. According to the Company's annual report filed, as amended, on Form 10-K/A for the year ended December 31, 2020 (the "2020 10-K/A"), as of March 12, 2021, Defendant Hsieh beneficially owned 1,059,500 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 12, 2021 was

$20.59, Defendant Hsieh owned $21,815,105 worth of LDI Class A common stock. In addition, according to the 2020 10-K/A, as of March 12, 2021, Defendant Hsieh beneficially owned 195,279,232 shares of the Company's Class C common stock, or approximately 98.3% of that class of stock. Certain members of LD Holdings controlled by Defendant Hsieh have the right to exchange their ownership of equity interests in LD Holdings ("Holdco Units") together with a corresponding number of shares of the Company's Class C common stock for cash or for shares of the Company's Class A common stock on a one-for-one basis. According to the 2020 10-K/A, the members of LD Holdings, nearly all of which are controlled by Defendant Hsieh, beneficially owned 198,669,112 Holdco Units following the consummation of the IPO. Thus, in addition to his disclosed beneficial ownership of Class A common stock, Defendant Hsieh is entitled to convert a substantial portion or perhaps all of his holdings of Class C common stock into Class A common stock to the extent he has an equal number of Holdco Units, which is not publicly disclosed. Moreover, Defendant Hsieh's holdings of the Company's securities on March 12, 2021 gave him control over 61.1% of the Company's total voting power, making him a majority controlling shareholder.

28.    The Company used proceeds from the IPO and cash on hand to repurchase certain Class A common units of LD Holdings from continuing members of LD Holdings, together with a corresponding number of shares of LDI Class C common stock, at a price per share equal to the IPO price of $14 per share. According to a Form 4 filed on February 22, 2021 with the SEC, Defendant Hsieh disposed of 2,699,981 shares of Class C common stock through this mechanism. Thus, in connection with the IPO, the Company paid approximately $37.8 million to members of LD Holdings for certain shares of Class C common stock over which Defendant Hsieh held voting and investment power.

29.     According to the Company's Form 8-K filed with the SEC on February 16, 2021,

Defendant Hsieh has an annual base salary of $850,000, subject to increase in the sole discretion

of the Board or one of its committees. He is also eligible to receive an annual bonus targeted at

250% of his base salary, with a maximum payout of 300% of that amount. According to the 2020

10-K/A, Defendant Hsieh received a bonus of $7.5 million in the first quarter of 2021 for the 2020

Fiscal Year, in addition to a bonus or bonuses of $42.5 million for the 2020 Fiscal Year .

30.     The Company's 2020 10-K/A stated the following about Defendant Hsieh:

> Mr. Hsieh founded LDLLC and has served as Chairman and Chief Executive
> Officer since its formation in December 2009. He has been Chairman and Chief
> Executive Officer of loanDepot, Inc. since its formation in November 2020. Mr.
> Hsieh has more than 30 years of experience in the lending industry. Prior to starting
> LDLLC, he was instrumental in the development and success of many mortgage
> lending firms. In 2002, Mr. Hsieh founded HomeLoanCenter.com, the first national
> online lender to offer a full spectrum of mortgage loan products featuring live
> interest-rate quotes and loan offerings tailored to borrowers' needs and credit
> profiles. He continued to lead the business for three years after it merged with
> IAC/Interactive subsidiary, LendingTree in 2004. In 1989, he acquired a mortgage
> brokerage company and transformed it into LoansDirect.com just as the internet
> sector was taking off. It became one of the most profitable and successful mortgage
> lenders throughout the 1990's before it was acquired by E*TRADE Financial in
> 2001.

**Defendant Flanagan**

31.     Defendant Flanagan joined LDLLC in 2017 and became LDLLC's CFO in 2019.

He was appointed to serve as the Company's CFO in January 2021, prior to the IPO.

32.     According to the 2020 10-K/A, Defendant Flanagan received a bonus of $2.4

million for the 2020 Fiscal Year, which was paid in the first quarter of 2021.

33.     The 2020 10-K/A stated the following about Defendant Flanagan:

> Mr. Flanagan was appointed Chief Financial Officer of LDLLC in December 2019,
> and joined the company in June 2017. Mr. Flanagan was appointed Chief Financial
> Officer of loanDepot, Inc. in January 2021. He has more than three decades of
> experience in the investment management, mortgage banking and fintech spaces,
> throughout which he has managed the origination, acquisition and servicing of

more than $300 billion in residential mortgage and residential real estate assets. Prior to joining LD Holdings, he served as Executive Vice President at Carrington Mortgage Services from May 2016 to May 2017. From February 2015 until April 2016, he was a consultant at Waterfall Asset Management ("Waterfall Asset"). Prior to joining Waterfall Asset, he served as Chief Executive Officer and founder of Cove Financial from August 2009 until December 2014. Mr. Flanagan earned his undergraduate degree from Monmouth College.

**Defendant Carrillo**

34.     Defendant Carrillo began serving as LDLLC's Executive Vice President, Chief Accounting Officer ("CAO") in July 2018, and she continued serving in that role at the Company at or before the time of the IPO.

35.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Carrillo made the following sale of Company common stock at an artificially inflated price:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| June 8, 2021 | 11,867 | $13.87 | $164,571 |

Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

36.     A July 9, 2018 press release announcing Defendant Carrillo's appointment to the position of Executive Vice President, CAO stated the following about Defendant Carrillo:

Carrillo brings more than 17 years' experience to her role, most recently as chief financial officer and executive vice president of Opus Bank, where she oversaw all accounting and financial functions, including financial performance, planning and reporting, liquidity management, investment portfolio performance, capital and interest rate risk management and coordination with external auditors, investors and banking regulators. She was also part of the management team that led the company through its initial public offering in 2014.

Prior to Opus Bank, Carrillo was a senior manager in the audit practice with KPMG

LLP serving a variety of private and public financial services clients.

*          *          *

Carrillo received her Bachelor of Science in Accounting from Loyola Marymount University and is a California Chartered CPA. She also is a board member of the United Way of Orange County and the Boys and Girls Club of Central Orange Coast.

### **Defendant Dodson**

37.     Defendant Dodson was appointed to serve as a director of LDLLC in December 2009 and as a director of LDI on February 11, 2021. Defendant Dodson is a Managing Partner at Parthenon Capital and has been with Parthenon Capital since 2005. The Parthenon Stockholders held 38.5% of the Company's total voting power as of March 12, 2021.

38.     According to the 2020 10-K/A, Defendant Dodson is eligible to receive $250,000 per year for service as a member of the Board, 50% of which will be paid in cash and 50% of which is to be issued in restricted stock units.

39.     The 2020 10-K/A stated the following about Defendant Dodson:

Mr. Dodson was appointed as a director of LDLLC in December 2009 and as a director of loanDepot, Inc. on February 11, 2021. Mr. Dodson is a Managing Partner at Parthenon Capital and has been with Parthenon Capital since 2005. Prior to joining Parthenon Capital, Mr. Dodson was a consultant with Bain & Co from 2004 to 2005. where he focused on mergers and acquisitions, cost control and corporate strategy for middle market technology companies. Mr. Dodson was also a financial analyst for Enron Corporation in the company's retail group and worked for Trilogy, Inc., an enterprise software company, where he focused primarily in business development. Mr. Dodson also serves on the boards of directors of EdgeCo Holdings, Envysion, ICD, Millennium Trust and Venbrook. Mr. Dodson earned a Bachelor of Arts from Duke University and a Master of Business Administration from the Harvard Business School.

### **Defendant Dorman**

40.     Defendant Dorman was appointed to serve as a director of LDLLC in July 2015 and as a director of the Company on February 11, 2021. He currently serves as Chair of the Audit Committee and as a member of the Compensation Committee and the Governance and Nominating

Committee.

41.     According to the 2020 10-K/A, Defendant Dorman is eligible to receive $250,000 per year for service as a member of the Board, 50% of which will be paid in cash and 50% of which is to be issued in restricted stock units. He is entitled to cash compensation of $25,000 per year for service as chairperson of the Audit Committee and an additional $25,000 due to his service on more than two Board committees.

42.     The April 23, 2021 Prospectus stated the following about Defendant Dorman:

Mr. Dorman was appointed as a director of LDLLC in July 2015 and as a director of loanDepot, Inc. on February 11, 2021. Mr. Dorman served as a director of Online Resources Corporation, a developer and supplier of electronic payment services, from May 2009 until it was sold to ACI Worldwide, Inc. in March 2013, and as its Chairman from June 2010 until the sale. Mr. Dorman previously served as Co-Chairman of Online Resources Corporation from January 2010 to June 2010, and as Interim Chief Executive Officer from April 2010 to June 2010. From October 1998 to August 2003, he served as Chief Executive Officer of Digital Insight Corporation, a provider of software-as-a-service for online banking and bill payment for financial institutions, and served on the board of directors of Digital Insight until the company was acquired in 2007 by Intuit, Inc. Mr. Dorman served as Senior Vice President of the Global Financial Services Division of Oracle Corporation from August 1997 to October 1998; and Chairman and Chief Executive Officer of Treasury Services Corporation, a provider of modeling and analysis software for financial institutions, from 1983 to 1997. Mr. Dorman also serves on the boards of directors of CoreLogic, Inc. (NYSE: CLGX) and DeepDyve, Inc. Mr. Dorman earned a B.A. in Business Administration and Philosophy from Occidental College and an M.B.A. in Finance from the University of Southern California.

**Defendant Golson**

43.     Defendant Golson was appointed to serve as a director of LDLLC in December 2009 and as a director of LDI on February 11, 2021. Defendant Golson is the Co-CEO and Managing Partner at Parthenon Capital and has been with Parthenon Capital since 2002. The Parthenon Stockholders held 38.5% of the Company's total voting power as of March 12, 2021.

44.     According to the 2020 10-K/A, Defendant Golson is eligible to receive $250,000

per year for service as a member of the Board, 50% of which will be paid in cash and 50% of which is to be issued in restricted stock units.

45.     The 2020 10-K/A stated the following about Defendant Golson:

Mr. Golson was appointed as a director of LDLLC in December 2009 and as a director of loanDepot, Inc. on February 11, 2021. Mr. Golson is the Co-CEO and Managing Partner at Parthenon Capital and has been with Parthenon Capital since 2002. Prior to joining Parthenon Capital, Mr. Golson was the Chief Financial Officer and Vice President of Operations for Everdream, a software company sold to Dell providing outsourced IT infrastructure management. Mr. Golson also held leadership positions with Prometheus Partners, a middle-market private equity fund focused on recurring revenue service businesses, and GE Capital where he focused on acquisitions and divestitures of financial services and insurance businesses. Mr. Golson also serves on the boards of directors of Bluesnap, eTix, BillingTree, PayRoc, Edge, eSec Lending, ICD, Periscope Holdings and DaySmart. Mr. Golson earned a Bachelor of Arts in Economics from the University of North Carolina, Chapel Hill and a Master of Business Administration from the Harvard Business School.

**Defendant Lepore**

46.     Defendant Lepore was appointed to serve as a director of LDLLC in July 2015 and as a director of LDI on February 11, 2021. She currently serves as Chair of the Compensation Committee, Chair of the Governance and Nominating Committee, and as a member of the Audit Committee.

47.     According to the 2020 10-K/A, Defendant Lepore is eligible to receive $250,000 per year for service as a member of the Board, 50% of which will be paid in cash and 50% of which is to be issued in restricted stock units. She is further entitled to additional cash compensation of $25,000 due to her service on more than two Board committees.

48.     The 2020 10-K/A stated the following about Defendant Lepore:

Ms. Lepore was appointed as a director of LDLLC in July 2015 and as a director of LOANDEPOT, Inc. on February 11, 2021. Ms. Lepore served as Interim Chief Executive Officer of Prosper Marketplace, Inc., an online peer-to-peer lending platform, from March 2012 to January 2013, and as Chairman and Chief Executive Officer of drugstore.com, inc., an online retailer of health and beauty care products,

14

from October 2004 until its sale to Walgreen Co. in June 2011. Prior to joining drugstore.com, Ms. Lepore held various leadership positions during her 21 years with The Charles Schwab Company, an investment services firm that provides brokerage, banking and investment-related services to consumers and businesses. Ms. Lepore also serves on the boards of directors of Accolade, Inc. (NASDAQ: ACCD) and RealNetworks, Inc. (NASDAQ: RNWK). Ms. Lepore previously served on the boards of directors of Coupons.com from February 2012 to November 2017, AOL Inc. from November 2012 to June 2015, The TJX Companies, Inc. from June 2013 to June 2014, eBay Inc. from December 1999 to January 2013, The New York Times Company from 2008 to 2011, drugstore.com, inc. from 2004 to 2011 and Wal-Mart Stores Inc. from 2001 to 2004. Ms. Lepore earned a B.A. from Smith College.

## <u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>

49.     By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of LDI and because of their ability to control the business and corporate affairs of LDI, the Individual Defendants owed LDI and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage LDI in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of LDI and its shareholders so as to benefit all shareholders equally.

50.     Each controlling shareholder, director, and officer of the Company owes to LDI and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

51.     The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors, and/or officers of LDI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

52.     To discharge their duties, the controlling shareholder, officers, and directors of LDI were required to exercise reasonable and prudent supervision over the management, policies,

controls, and operations of the Company.

53.     Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors, and officers of LDI, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the controlling shareholder, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of LDI's Board at all relevant times.

54.     As the controlling shareholder, senior executive officers, and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to

ensure the Company remained in compliance with all applicable laws.

55.     To discharge their duties, the controlling shareholder, officers, and directors of LDI were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholder, officers, and directors of LDI were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to LDI's own Code of Ethics (the "Code");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how LDI conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of LDI and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that LDI's operations would comply with all applicable laws and LDI's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements

made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

56.     Each of the Individual Defendants further owed to LDI and the shareholders the duty of loyalty requiring that each favor LDI's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

57.     At all times relevant hereto, the Individual Defendants were the agents of each other and of LDI and were at all times acting within the course and scope of such agency.

58.     Because of their advisory, executive, managerial, directorial, and controlling positions with LDI, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

59.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by LDI.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

61.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

62.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of LDI was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

63.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

64.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of LDI, and was at all times acting within the course and scope of such agency.

## THE COMPANY'S CODE OF ETHICS AND CORPORATE GOVERNANCE

### Code of Ethics

65.   LDI's Code states that "[a]ll directors, officers and employees are required to be familiar with the Code." It further states that the Board adopted the Code "in order to deter wrongdoing and promote" the following:

- "honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;"

- "full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission . . . and in other public communications made by the Company;"

- "compliance with applicable governmental laws, rules and regulations;"

- "the prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code; and"

- "accountability for adherence to the Code."

66.   In section titled "Honest and Ethical Conduct," the Code states as follows, in relevant part:

Each director, officer and employee must act with integrity and observe the highest ethical standards of business conduct in his or her dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job.

67.   In a section titled "Conflicts of Interest," the Code states as follows, in relevant part:

A conflict of interest occurs when an individual's private interest interferes, or even appears to interfere, with the interests of the Company as a whole. A conflict of

interest can arise when an employee, officer or director takes actions or has interests that may make it difficult for that person to perform work for the Company objectively and effectively. Conflicts of interest also arise when an employee, officer or director (or a member of his or her family) receives improper personal benefits as a result of his or her position in the Company.

*         *         *

Whether or not a conflict of interest exists or will exist can be unclear. Conflicts of interest should be avoided unless specifically authorized . . . .

68.  In a section titled "Protection and Proper Use of Company Assets," the Code states as follows, in relevant part:

All directors, officers and employees should protect the Company's assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on the Company's profitability and are prohibited.

69.  In a section titled "Compliance," the Code states as follows:

Directors, officers and employees should comply, both in letter and spirit, with all applicable laws, rules and regulations in the cities and states in which the Company operates.

Although not all directors, officers and employees are expected to know the details of all applicable laws, rules and regulations, it is important to know enough to determine when to seek advice from appropriate personnel. Questions about compliance should be addressed to the Legal Department.

Insider trading is unethical, illegal and a violation of the Company's Insider Trading Policy.

70.  In a section titled "Disclosure," the Code states as follows:

The Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules.

Each director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each director, officer and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.

Each director, officer and employee who is involved in the Company's disclosure process must:

1. be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and

2. take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

71.     In a section titled "Reporting and Investigation of Violations," the Code provides

as follows, in relevant part:

After receiving a report of an alleged prohibited action, the Audit Committee, the Chief Executive Officer, Chief Financial Officer, or General Counsel or the relevant supervisor must promptly take all appropriate actions necessary to investigate.

All directors, officers and employees are expected to cooperate in any internal investigation of misconduct.

***Audit Committee Charter***

72.     The Company's Audit Committee Charter specifies that the Audit has the purpose

of assisting the Board with oversight of: (1) "the integrity of the Company's financial statements";

(2) "the systems of internal accounting and financial controls"; (3) "compliance with legal and

regulatory requirements"; (4) "the Company's independent auditor's qualifications and

independence"; and (5) "the performance of the Company's independent auditor and internal audit

function, if any."

73.     The Audit Committee Charter states that the Audit Committee's responsibilities

include oversight of internal controls, as follows:

To review with management, internal audit, and the Company's independent auditor the adequacy and effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies, material weaknesses or other major issues in the design or operation of, and any material changes in, the Company's controls and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such internal controls, and review and discuss with management and the Company's independent

auditor disclosure relating to the Company's controls, management's and the independent auditor's report on the effectiveness of the Company's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable.

74.     The Audit Committee Charter also tasks the Audit Committee with risk oversight, as follows:

To review and discuss with management the risks faced by the Company and the policies, guidelines and process by which management assesses and manages the Company's risks, including the Company's major financial risk exposures and cybersecurity risks and the steps management has taken to monitor and control such exposures.

75.     The Audit Committee Charter also provides that the Board is responsible for reviewing compliance matters that could significantly impact the Company's financial statements, as follows:

To review, with the General Counsel and outside legal counsel, legal and regulatory matters relating to the Company and its subsidiaries that could have a significant impact on the Company's financial statements; to review the Company's compliance with applicable laws and regulations; and to review and oversee the Company's policies, procedures and programs designed to promote and monitor legal and regulatory compliance and sustainability.

76.     The Audit Committee Charter further provides that the Audit Committee is charged with establishing and overseeing procedures for the receipt, retention and treatment of whistleblower complaints, as follows:

To establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

77.     In violation of the Code, the Audit Committee Charter, and the Company's corporate governance documents, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public

and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and the aiding and abetting thereof. Moreover, one of the Individual Defendants violated the Code and the Company's Insider Trading Policy by selling Company shares at inflated prices for aggregate proceeds in excess of $164,000, and the Individual Defendants caused the Company to repurchase shares of its Class C common stock at artificially inflated prices. Further in violation of the Company's corporate governance documents, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code.

## **BACKGROUND**

78.     LDI is a Delaware corporation with its principal executive offices in Foothill Ranch, California. The Company's business consists in large part of originating, financing, selling, and servicing residential mortgage loans, and it also engages title, escrow, and settlement services for mortgage loan transactions. The Company derives income primarily from gains on the origination and sale of loans to investors, income from loan servicing, and fees charged for settlement services related to the origination and sale of loans.

79.     In the IPO and throughout the Relevant Period, the Individual Defendants caused the Company to tout LoanDepot's growth, recapture rate, number of originations, revenues, and margins, while failing to disclose that these metrics were artificially inflated due to LoanDepot's engagement in the Interest Overcharging and the Origination Conduct. Furthermore, the Individual Defendants failed to disclose that the Company's refinance originations and gain-on-sale margins had already declined substantially at the time of the IPO, and they failed to disclose the negative

ramifications of the foregoing on the Company's business, operations, and prospects.

**Interest Overcharging**

80.     As detailed in the California Complaint filed by Richards in September 2021, the

Company has engaged in the Interest Overcharging. Specifically, Richards alleged that between at

least 2016 and 2019, LoanDepot was charging loan refinance borrowers twice over during a period

when CUSA had failed to pay off the original loans, stating as follows:

> In November 2019, Ms. Richards had discovered that between at least 2016 and
> 2019, discovered that LoanDepot and CUSA were charging loan refinance
> borrowers double daily interest or per diem as a result of CUSA's failure to timely
> pay off the original loans, as both the new loan and old loan would both per diem
> until the old loan was paid off. The problem was reflected in the fact that the closing
> disclosure documents inaccurately reflected a closing date of the date that the loan
> documents were printed, not the date in which the original loan was actually paid,
> thereby causing the borrower to pay double per diem.

81.     Richards alleged that, when she raised the issue to Defendant Hsieh and LDI's

Chief Legal Officer Peter MacDonald, she was informed that Defendant Hsieh "had made the

calculated decision that they would only return some of the money to borrowers in states that had

attorneys generals that were more diligent in enforcing compliance, whereas the CUSA would not

return any money to those states whose attorneys generals would likely not discover the issue."

**Origination Conduct**

82.     Richards also alleged in the California Complaint that the Company had engaged

in the Origination Conduct by closing loans without proper documentation. Richards stated that

Defendant Hsieh's greed would lead him to take any means necessary to inflate the Company's

value, alleging as follows:

> that based upon her past experience with Hsieh's willingness to cross ethical,
> fiduciary and boundaries, to satisfy his greed and obsession with being number one,
> ***she believed that it would be only a matter of time that Hsieh would begin to take
> a "by any means necessary" approach for the purpose of fraudulently inflating
> LoanDepot's value.***

(Emphasis added.)

83.     Richards alleged in the California Complaint that Defendant Hsieh's greed eventually led to a "one of the most egregious wide scale fraud for profit schemes" seen since the Great Recession, alleging as follows:

> Hsieh's tight rope walk across ethical and legal boundaries finally crossed the line in August of 2020, as Hsieh moved forward with his plan that would ultimately constitute one of the most egregious wide scale fraud for profit schemes since the months and years leading up to the Great Recession. Having seen the pain endured by Americans and devastation caused to the U.S. economy during the Great Recession as a result of unbridled greed and corruption that poisoned the mortgage industry from its executives to its loan brokers, Ms. Richards would soon witness Hsieh and other LoanDepot executives become fully infected by this disease, as making money took precedent over any other considerations.

84.     In the California Complaint, Richards alleges that the Origination Conduct began on or about August 26, 2020, when Defendant Hsieh ordered that loans be closed even without proper documentation:

> On or about August 26, 2020, Hsieh finally began to initiate his wide scale fraud for profit scheme. During a production meeting in which Ms. Richards was present, Hsieh began to scream "I am Mello Clear, and we must immediately close loans regardless of documentation!" Hsieh had informed the sales team that they were not closing enough loans, and that sales "should not stand for this." Hsieh actions essentially declared open season on Operations by the sales team.

85.     As Richards observes in the California Complaint, "[c]losing loans without documentation is illegal and would violate numerous federal laws, including the Dodd-Frank Title XIV - Mortgage Reform and Anti-Predatory Lending Act." Richards further states that she informed LDLLC's Senior Executive Vice President Jeff Walsh "that Hsieh's urging of the production team to close loans without documentation was illegal."

86.     In the California Complaint, Richards states that Defendant Hsieh caused the Company to conduct an investigation of its underwriting practices to determine whether loan

applicants were being denied that should have been approved. However, the results of the investigation were contrary to Defendant Hsieh's suspicions:

> Following Hsieh's seemingly unlawful directive, he caused the Company to conduct a full-scale investigation to determine if underwriting was over conditioning, by denying loan applicants due to more conservative guidelines and standards, that would otherwise be approved. The results of the investigation would prove to show that Hsieh's belief was in fact unfounded. However, despite his baseless claims that the Company was underperforming as a result of operations somehow hampering loan approvals, Hsieh continued on his path of disregarding legal guidelines and policies, purely for his own narcissistic and greed-driven satisfaction.

87.     In the California Complaint, Richards alleges that Defendant Hsieh's efforts to cause the Company to close loans without proper documentation continued on October 28, 2020:

> On or about October 28, 2020, Hsieh once again flew into a hellish rage towards Ms. Richards. Hsieh began screaming, "close all loans ... close without credit reports ... close without documentation ... close all loans!" He continued, "we are setting records every month and have grown  staffing and capacity, but it's not enough! Trust our borrowers and close loans without documents! I  already paid taxes on these loans and the loans are already shown as revenue!" In response to Hsieh's maddening rant, Ms. Richards told Hsieh that she cannot and will not close loans without credit reports.

88.     As described in the California Complaint, Defendant Hsieh's orders to close loans without supporting documentation had concrete effects at the Company:

> During this time, and following the discovery, [Tomo] Yebisu [("Yebisu")] had begun to implement the "Torno Promo" in order to get sales associates to close "no-doc" loans. The "Torno Promo" was aphrase commonly used throughout the Company, where Y ebisu would go on to the sales floor with $100 bills push the sales agents for increased production numbers while he would exclaim that he would "made it rain" dollars for those over performing sales agents. Ms. Richards spoke with Yebisu and informed him that what he and Hsieh were doing was wrong, and that Hsieh was treating her abusively. In response, Yebisu stated that "it is Hsieh's company, and "we are required to do whatever he tells us to do," "we have no choice." Richards retorted Yebisu's response by stating "we do have choices when it comes to doing the right thing."

89.     In the California Complaint, Richards alleged that Yebisu's response "was typical of the entire management team" and of "all employees of LoanDepot for that matter."

90.     Richards alleged in the California Complaint that Defendant Hsieh again demanded on October 29, 2020 that loans be closed without documentation, stating as follows:

> On or about October 29, 2020, Hsieh once again demanded that Ms. Richards "clear her pipeline" to "close loans without documentation" and to "stop underwriting them."

91.     Richards further alleges that she was removed from her position in retaliation for her refusal to close loans without proper documentation:

> Hsieh became enraged by Ms. Richards' refusal to participate in such illegal and unethical conduct, and immediately began to retaliate against her. At first, he would hurl vulgarities and insults towards her, expressing his dismay in her unwillingness to do what was necessary to make LoanDepot the fastest and most voluminous loan originator in the industry. Then on November 4, 2020, in retaliation for her refusal to participate in these illegal activities, Ms. Richards was informed that she would no longer be managing the processing of loans in the Direct Channel.

92.     In the California Complaint, Richards alleges that, after Defendant Hsieh removed her from directing her leadership team, Defendant Hsieh directed the Processing Team to engage in the Origination Conduct:

> Having removed Ms. Richards from directing her leadership team, on Yebisu's first day in control of operations, Hsieh informed the Processing Team that he wanted 200 processors to each close 100 loans per month, without documentation in order to "clear out the pipeline."

93.     As alleged in the California Complaint, at an executive meeting held on or about November 16, 2020, Defendant Hsieh again ordered that the Company engage in the Origination Conduct:

> At the executive meeting, Hsieh, once again, forcefully reiterated to the Company's executives that they must execute his directive in causing the operations continue to close loans without documentation.

94.     Moreover, Richards alleged in the California Complaint that she soon learned "about another dubious and illegal policy that was being implemented by Hsieh surreptitiously titled 'Project Alpha.'" Specifically, she alleged that Defendant Hsieh initiated "Project Alpha" on

the day following the November 16, 2020 executive meeting, stating as follows:

> Ms. Richards would learn from Walsh that Project Alpha was a scheme in which Hsieh would personally identify 8,000 + loans, that would be closed without documentation. Hsieh identified 200 processors that would have super authority to close these loans without documentation, and in exchange these processors would receive extra bonuses if those loans closed by the end of November.

95.     In the California Complaint, Richards alleged that Defendant Hsieh explicitly directed the Company's Chief Credit Officer, Brian Rugg "to refrain from auditing the nearly 8,000 loans illegally processed through Project Alpha." As alleged by Richards, and as evidenced by an attachment to the California Complaint, Chief Credit Officer Brian Rugg emailed Richards on November 18, 2020, informing her that Defendant Hsieh was placing pressure on him to ignore certain loans.

96.     Furthermore, in the California Complaint, which was filed on September 21, 2021, Richards alleged that the Company was required to write down loans due to the Origination Conduct, resulting in the Company missing quarterly profit expectations. Specifically, she alleged as follows:

> more recently, ***as a result of the non-compliant loans processed through Project Alpha, LoanDepot has had write-down those loans,*** because of the problems associated with them, ***causing the Company to miss its quarterly profit projections.***

(Emphasis added.)

97.     As further alleged in the California Complaint, Defendant Hsieh promised the Company's executives, including Richards, that if LDLLC went public, the executives "would receive a significant increase in bonuses, including an increase in the annual cash bonus, and a one-time discretionary bonus."

98.     Richards' allegations concerning the Origination Conduct and Defendant Hsieh's participation in and direction thereof demonstrate Defendant Hsieh's motive in making the false

and misleading statements alleged herein, which had the effect of inflating the price of the Company's securities at the time of the IPO and throughout the Relevant Period.

### February 2021 IPO

99.     In late 2020, the Individual Defendants began taking steps to prepare for and execute LDI's IPO. Specifically, the Individual Defendants caused LoanDepot to make large payments to insiders around the time of the IPO, and they filed documents with the SEC to initiate LDI's IPO.

100.     As stated in the Registration Statement, in November 2020, LD Holdings paid profit distributions of $278.8 million to certain unitholders pursuant to an operating agreement. Then, in December 2020, LD Holdings distributed $71.1 million to its unitholders based on their estimated tax liability. In addition, as stated in the 2020 10-K/A, subsequent to December 31, 2020, LD Holdings declared profit distributions and tax distributions to its unitholders resulting in total cash distributions of $159 million. In addition to these dividends, Company insiders received additional payouts around the time of the IPO. As announced in the Company's Form 8-K filed on May 13, 2021, LD Holdings declared a cash dividend on its units on or around the time of that filing, to be paid in July 2021. Thus, around or prior to the time of the IPO, insiders stripped LD Holdings of its cash, resulting in harm to LDI and LDI shareholders.

101.     On November 12, 2020, the Company filed its Draft Registration Statement, which was subsequently amended on December 22, 2021. On January 11, 2021, the Company filed its Registration Statement on Form S-1, which was subsequently amended on January 21, January 27, February 1, February 4, and February 9, 2021. On February 10, 2021, the SEC declared the Registration Statement effective.

102.     LDI's stock began trading publicly on the NYSE on February 11, 2021. The

Company and the Parthenon Stockholders sold a total of 4,427,500 shares of Class A common stock in the IPO at a price of $14.00 per share. The Company sold a total of 2,753,100 shares, or approximately 62% of the total, while the Parthenon Stockholders sold 1,674,400 shares, or approximately 38%. The Company raised net proceeds of $36.2 million, after deducting underwriting discounts and commissions.

103.   The following chart, extracted from the Prospectus, demonstrates the beneficial ownership of the Company prior to and immediately following the IPO:

| Name of Beneficial Owner | Class A Common Stock Beneficially Owned after giving effect to the Reorganization Transactions (on a fully exchanged and converted basis) (1) (2) | | | | | | Class D Common Stock Beneficially Owned after giving effect to the Reorganization Transactions (on a fully exchanged and converted basis) (1) (3) | | | | | | Combined Voting Power (4) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Before This Offering | | After This Offering | | After This Offering & Option Exercise | | Before This Offering | | After This Offering | | After This Offering & Option Exercise | | Before This Offering | After This Offering | After This Offering & Option Exercise |
| | # | % | # | % | # | % | # | % | # | % | # | % | % | % | % |
| Entities affiliated with Parthenon Capital (5) | 124,810,608 | 38.4% | 123,309,280 | 37.9% | 123,084,080 | 37.9% | 121,368,600 | 37.6% | 119,912,600 | 37.1% | 119,694,200 | 37.1% | 38.6% | 38.5% | 38.5% |
| *Executive Officers and Directors:* | | | | | | | | | | | | | | | |
| Anthony Hsieh (6) | 130,837,895 | 40.3% | 129,128,832 | 39.7% | 128,872,472 | 39.7% | — | — | — | — | — | — | 61.3% | 61.1% | 61.1% |
| Patrick Flanagan (7) | — | — | — | — | — | — | — | — | — | — | — | — | | * | |
| Jeff Walsh (7) | — | — | — | — | — | — | — | — | — | — | — | — | | * | |
| Jeffrey DerGurahian (7) | — | — | — | — | — | — | — | — | — | — | — | — | | * | |
| Brian Golson (8) | — | — | — | — | — | — | — | — | — | — | — | — | | * | |
| Andrew Dodson (8) | — | — | — | — | — | — | — | — | — | — | — | — | | * | |
| John Dorman (7) | — | — | — | — | — | — | — | — | — | — | — | — | | * | |
| Dawn Lepore (7) | — | — | — | — | — | — | — | — | — | — | — | — | | * | |
| Nicole Carrillo (7) | — | — | — | — | — | — | — | — | — | — | — | — | | * | |
| Executive Officers and Directors as a group (9 person | 130,837,895 | 40.3% | 129,128,832 | 39.7% | 128,872,472 | 39.7% | — | — | — | — | — | — | 61.3% | 61.1% | 61.1% |

## Disclosure Requirements

104.   SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies, such as LDI, with respect to their finances and operations. Specifically, Item 303(b)(2)(i) required LDI to:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, would be material to an understanding of the registrant's results of operations.

105.   Item 303(b)(2)(ii) required LDI to:

Describe any known trends or uncertainties that have had or that are reasonably

likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed.

106.    Additionally, Item 105 of Regulation S-K required the Individual Defendants to provide "a discussion of the material factors that make an investment in the registrant or offering speculative or risky."

107.    Even after the IPO was effectuated, the Individual Defendants had a duty to disclose pursuant to Item 303 of Regulation S-K, which requires that all Form 10-Qs and 10-Ks filed with the SEC include a section on "[m]anagement's discussion and analysis of financial condition and results of operations" that includes, *inter alia*: (1) "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations," (2) "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," (3) "descriptions and amounts of matters that have had a material impact on reported operations," and (4) "matters that are reasonably likely based on management's assessment to have a material impact on future operations."

108.    Therefore, the Individual Defendants had a duty to cause the Company to disclose all material facts related to: (1) the Interest Overcharging; (2) the Origination Conduct; (3) declining originations, and the cause(s) thereof; (4) declines in the Company's gain-on-sale margins; (5) any significant plans to reduce expenses; and (6) the Company's failure to maintain adequate controls. These issues had a foreseeable impact on the Company's financial performance and prospects.

**False and Misleading Statements Made Prior to the Relevant Period**

*January 11, 2021 Registration Statement and Amendments*

109.    On January 11, 2021, the Company filed the Registration Statement with the SEC on Form S-1. The Registration was signed by Defendants Hsieh, Flanagan, and Carrillo, and it took substantially the same form as the Draft Registration Statement filed on November 12, 2020. Defendants Dodson, Dorman, Golson, and Lepore signed forms, attached to the Registration Statement, that indicated their consent to being named directors of the Company in connection with the IPO. The Company subsequently filed amendments to the Registration Statement on January 21, January 27, February 1, February 4, and February 9, 2021, and the Registration Statement, as amended, was declared effective on February 10, 2021.

110.    The Registration Statement stated the following concerning the Company's business:

> loanDepot is a customer-centric, technology-empowered residential mortgage platform with a widely recognized consumer brand. We launched our business in 2010 to disrupt the legacy mortgage industry and make obtaining a mortgage a positive experience for consumers. We have built a leading technology platform, designed around the consumer that has redefined the mortgage process. Our digital-first approach has allowed us to become one of the fastest-growing, at-scale mortgage originators in the U.S.
>
> *         *         *
>
> Consumer-facing industries continue to be disrupted by technological innovation. The mortgage industry is no different with consumers expecting increased levels of convenience and speed. ***The residential mortgage market in the U.S. is massive— with approximately $11.0 trillion of mortgages outstanding as of September 30, 2020—and is largely served by legacy mortgage originators, which require consumers to navigate time-consuming and paper-based processes to apply for and obtain mortgage loans. mello®, our proprietary end-to-end technology platform, combined with our differentiated data analytics capabilities and nationally recognized consumer brand, uniquely positions us to capitalize on the ongoing shift towards at-scale, digitally-enabled platforms.***
>
> ***Our innovative culture and contemporary consumer brand represent key differentiators for loanDepot.*** We have fostered an entrepreneurial mindset and relentlessly deliver an exceptional experience to our customers. Our guiding

principle is to delight our customers by exceeding their expectations.

\*                    \*                    \*

We are a data driven company. We utilize data from lead acquisition, digital marketing, in-market relationships, and our servicing portfolio to identify and acquire new customers and retain our existing customers. During the last twelve months, we have analyzed, enriched, and optimized more than 9 million customer leads with a deep understanding of each potential customer's financial profile and needs. We also maintain *mello DataMart*, an extensive proprietary data warehouse of over 38 million contacts generated over our ten-year history. Our predictive analytics, machine learning and artificial intelligence drive optimized lead performance.

We leverage our brand, technology and data to serve customers across our two interconnected strategies: Retail and Partner. Our Retail strategy focuses on directly reaching consumers through a combination of digital marketing and more than 2,000 digitally-empowered licensed mortgage professionals. In our Partner strategy, we have established deep relationships with mortgage brokers, realtors, joint ventures with home builders, and other referral partners. These partnerships are valuable origination sources with lower customer acquisition costs. Our technology is a key component of the value proposition to these partner relationships, allowing us to integrate directly into our partners' native systems. We maintain integrated referral relationships with several leading brands, including a partnership with one of the 10 largest U.S. retail banks by total assets. During 2019, our Retail strategy produced 72% of our origination volume, with our Partner strategy representing the remaining 28%.

Our digital-first approach across our Retail and Partner strategies leverages the power of *mello*® to create a streamlined experience for consumers. Our predictive models route leads to the right loan officer at the right time to optimize the consumer's experience and best serve their needs. Based on each consumer's needs and preferences, leads are directed to in-house or in-market loan officers, team members at our centralized operations locations, or our digital self-service platform. Our in-market loan officers are able to leverage their long-term relationships as well as our proprietary *mello*® platform and loanDepot brand, driving improved profitability per loan officer.

\*                    \*                    \*

Our national brand along with our expertise in digital marketing, big data and marketing analytics, not only drives new customer acquisition, but also maximizes retention and customer lifetime value. We leverage these capabilities to "recapture" existing customers for subsequent refinance and purchase transactions. ***Our recapture rates are among the highest in the industry—for the nine months ended September 30, 2020, our organic refinance consumer direct recapture rate was 61% highlighting the efficacy of our marketing efforts and the strength of our customer relationships. This compares to an industry average refinance recapture rate of only 18% for the three months ended September 30, 2020*** according to Black Knight Mortgage Monitor. In addition, we achieved an overall

organic recapture rate of 47% for the nine months ended September 30, 2020. O*ur recapture originations have lower customer acquisition costs than originations to new customers, positively impacting our profit margins.*

*We have significantly increased our originations market share from 1.1% in 2014 to 2.6% for the first nine months of 2020, and our strong consumer brand and proprietary technology platform have positioned us to continue gaining additional share.* Our Retail and Partner strategies have led to a balanced mix of purchase and refinance mortgages, with purchase originations representing 41% of total originations in 2019. We have a well-defined plan to accelerate this growth by expanding upon our technological and brand advantages, growing our market share in both purchase and refinance markets, and further increasing customer retention and lifetime value. Secular demographic and housing market tailwinds provide further support for our competitive advantages.

*Our platform and technology create a significant financial advantage.* Our brand effectiveness and marketing capabilities optimize our customer acquisition costs, and our automation reduces unnecessary expenses throughout the origination process. We are able to scale quickly and efficiently which allows us to grow both transaction volume and profitability. During the COVID-19 pandemic, our technology platform and culture enabled us to hire, train and onboard over 3,500 new team members remotely. Our growth and profitability during the last nine months is further evidence of the scalability of our platform and validates the investments we have made in our brand and our technology. *For the nine months ended September 30, 2020, we generated $63.4 billion in originations (116% year-over-year growth), $3.0 billion in revenue (227% year-over-year growth), $1,465.9 million in net income and $1,085.9 million in adjusted net income, making us one of the fastest-growing and most profitable companies in our industry.*

(Emphasis added.)

111.    The Registration Statement touted the growth of LoanDepot as follows:

We have demonstrated our ability to grow our business and market share, having grown from a de novo start-up in 2010 to the second largest non-bank retail originator in the U.S. with a 2.6% share of a $11.0 trillion mortgage market as of September 30, 2020. We believe that we are well positioned to continue our market share growth through both our Retail strategy, where we have invested in our team members and technology to enable rapid scaling, and our Partner strategy, where independent brokers, in addition to joint venture and integrated referral partners, increasingly choose to work with us based on our reputation for excellent customer service and seamless user experiences. *Our growth has accelerated in recent quarters as our long-term investments in brand marketing and innovative technology have helped us achieve industry-leading growth and profitability.*

(Emphasis added.)

112.   The Registration Statement also included the following chart touting the growth in originations over the history of LoanDepot's existence:



**loanDepot Originations**
($ in billions)

113.   Furthermore, the Registration Statement touted that such growth was likely to continue, stating as follows: "We believe that ***continuing to make these investments will allow us to grow market share, increase customer retention and deliver enhanced returns that will ultimately enable a virtuous cycle of further investment and returns.***" (Emphasis added.)

114.   The Registration Statement also touted LoanDepot's market share:

We've created a company that is built to serve customers throughout the entire loan transaction, from the onset of the purchase or refinance decision through loan closing and servicing. ***We now possess roughly 3% market share of annual mortgage origination volumes,*** which makes up part of the $11T total addressable market. Thanks to our brand investment over time, we are also one of the most recognized brands in the industry today. ***All of this gives us enormous runway.***

(Emphasis added.)

115.   The Registration Statement touted LoanDepot's year-over-year growth for the

period ended September 30, 2020, stating as follows: "We originated $79.4 billion of loans for the twelve months ended September 30, 2020 and **experienced 116% year-over-year origination volume growth for the nine months ended September 30, 2020.**" (Emphasis added.)

116.    The Registration Statement also touted that LoanDepot's investments in its brand created a significant barrier to entry for competitors:

> We believe that we are one of only two non-banks with a nationally-recognized consumer brand in the U.S. retail mortgage origination industry. Since the Company's launch in 2010, we have invested over $1.2 billion in marketing and the promotion of our brand, and we believe there are significant barriers-to-entry in creating a brand comparable to ours.

117.    The Registration Statement also touted LoanDepot's superior ability to maximize customer retention and customer lifetime value, stating:

> **Our recapture rates are among the highest in the industry—for the nine months ended September 30, 2020, our organic refinance consumer direct recapture rate was 61% highlighting the efficacy of our marketing efforts and the strength of our customer relationships. This compares to an industry average refinance recapture rate of only 18%** for the three months ended September 30, 2020 according to Black Knight Mortgage Monitor. In addition, we achieved an overall organic recapture rate of 47% for the nine months ended September 30, 2020. Our recapture originations have lower customer acquisition costs than originations to new customers, positively impacting our profit margins.

(Emphasis added.)

118.    The Registration Statement also touted LoanDepot's recent increase in origination market share and the purportedly significant financial advantage of LoanDepot's platform and technology:

> **We have significantly increased our originations market share from 1.1% in 2014 to 2.6% for the first nine months of 2020, and our strong consumer brand and proprietary technology platform have positioned us to continue gaining additional share.** Our Retail and Partner strategies have led to a balanced mix of purchase and refinance mortgages, with purchase originations representing 41% of total originations in 2019. We have a well-defined plan to accelerate this growth by expanding upon our technological and brand advantages, growing our market share in both purchase and refinance markets, and further increasing customer retention and lifetime value. Secular demographic and housing market tailwinds provide further support for our competitive advantages.

Our platform and technology create a significant financial advantage. Our brand effectiveness and marketing capabilities optimize our customer acquisition costs, and our automation reduces unnecessary expenses throughout the origination process. We are able to scale quickly and efficiently which allows us to grow both transaction volume and profitability. During the COVID-19 pandemic, our technology platform and culture enabled us to hire, train and onboard over 3,500 new team members remotely. Our growth and profitability during the last nine months is further evidence of the scalability of our platform and validates the investments we have made in our brand and our technology. For the nine months ended September 30, 2020, we generated $63.4 billion in originations (116% year-over-year growth), $3.0 billion in revenue (227% year-over-year growth), $1,465.9 million in net income and $1,085.9 million in adjusted net income, making us one of the fastest-growing and most profitable companies in our industry.

(Emphasis added.)

119.     The Registration Statement further touted LoanDepot's ability to respond to increased market demand:

While the financial markets have demonstrated significant volatility due to the economic impacts of COVID-19, interest rates have fallen to historic lows resulting in increased mortgage refinance originations and favorable margins. Our efficient and scalable platform has enabled us to respond quickly to the increased market demand.

120.     In the amended Registration Statements filed on February 4 and February 9, 2021, additional information was appended to the statement contained in ¶ 119, such that the statement read as follows:

While the financial markets have demonstrated significant volatility due to the economic impacts of COVID-19, interest rates have fallen to historic lows resulting in increased mortgage refinance originations and favorable margins. Our efficient and scalable platform has enabled us to respond quickly to the increased market demand. ***Market demand in 2020 was driven by a prolonged period of historically low interest rates. This demand contributed to gain on sale margins reaching levels that the Company does not believe will be sustained in future years and could result in decreases in revenue.***

(Emphasis added.)

121.     The statement referenced in ¶ 120 was materially false and misleading when made because margins and revenues were already being adversely affected in the current year, that is, 2021, and would continue to be affected in the very next quarter and in the same year.

122.    The Registration Statement also included the following risk disclosure:

Our loan originations, particularly our refinance mortgage loan volume, are dependent on interest rates and are expected to decline *if interest rates increase*. Our loan origination activities are also subject to overall market factors that can impact our ability to grow our loan production volume. For example, *increased competition from* new and existing market participants, slow growth in the level of new home purchase activity or reductions in the overall level of refinancing activity *can impact our ability to continue to grow our loan origination volume, and we may be forced to accept lower margins in order to continue to compete and keep our volume of activity consistent with past or projected levels.*

123.    The statement referenced in ¶ 122 was materially false and misleading because the Company was already experiencing increased competition that was having a negative impact on margins.

124.    The Registration Statement further touted the Company's success in increasing mortgage refinance originations and favorable margins, even during the COVID-19 pandemic:

While the financial markets have demonstrated significant volatility due to the economic impacts of COVID-19, interest rates have fallen to historic lows resulting in increased mortgage refinance originations and favorable margins. Our efficient and scalable platform has enabled us to respond quickly to the increased market demand. We have highlighted below the key steps we have undertaken since the onset of the pandemic to position our platform for continued success:
- Maintained higher liquidity levels from an increase in cash from retained earnings.
- Increased our total loan funding capacity with our current lending partners.
- Stepped up protocols related to verification of key metrics such as employment and income to ensure the highest quality underwriting standards are maintained.
- Transitioned our workforce to working remotely as of March 19, 2020.

125.    The statements referenced in ¶¶ 110–20, 122, and 124 were materially false and misleading and omitted to state, *inter alia*, that: (1) LoanDepot had engaged in the Interest Overcharging and the Origination Conduct; (2) LoanDepot's refinance originations had declined significantly at the time of the IPO due to competition and industry saturation; (3) LoanDepot's gain-on-sale margins had declined substantially by the time of the IPO; (4) significantly lower growth and refinance originations had already forced the Company to embark on an expense

reduction plan; (5) as a result of all the foregoing, the Company's revenue and growth would be negatively impacted; and (6) the Company failed to maintain adequate internal controls.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### False and Misleading Statement Made During the Relevant Period

#### February 16, 2021 Prospectus

126.    On February 16, 2021, the Company filed the Prospectus on Form 424B4, which contained false and misleading statements.

127.    The Prospectus stated the following concerning the Company's business:

loanDepot is a customer-centric, technology-empowered residential mortgage platform with a widely recognized consumer brand. We launched our business in 2010 to disrupt the legacy mortgage industry and make obtaining a mortgage a positive experience for consumers. We have built a leading technology platform designed around the consumer that has redefined the mortgage process. Our digital-first approach has allowed us to become one of the fastest-growing, at-scale mortgage originators in the U.S.

\*                  \*                  \*

Consumer-facing industries continue to be disrupted by technological innovation. The mortgage industry is no different with consumers expecting increased levels of convenience and speed. ***The residential mortgage market in the U.S. is massive—with approximately $11.0 trillion of mortgages outstanding as of September 30, 2020—and is largely served by legacy mortgage originators, which require consumers to navigate time-consuming and paper-based processes to apply for and obtain mortgage loans. mello®, our proprietary end-to-end technology platform, combined with our differentiated data analytics capabilities and nationally recognized consumer brand, uniquely positions us to capitalize on the ongoing shift towards at-scale, digitally-enabled platforms.***

***Our innovative culture and contemporary consumer brand represent key differentiators for loanDepot.*** We have fostered an entrepreneurial mindset and relentlessly deliver an exceptional experience to our customers. Our guiding principle is to delight our customers by exceeding their expectations.

\*                  \*                  \*

We are a data driven company. We utilize data from lead acquisition, digital marketing, in-market relationships, and our servicing portfolio to identify and acquire new customers and retain our existing customers. During the last twelve months, we have analyzed, enriched, and optimized more than 9 million customer leads with a deep understanding of each potential customer's financial profile and needs. We also maintain *mello DataMart*, an extensive proprietary data warehouse of over 38 million contacts generated over our ten-year history. Our predictive analytics, machine learning and artificial intelligence drive optimized lead performance.

We leverage our brand, technology and data to serve customers across our two interconnected strategies: Retail and Partner. Our Retail strategy focuses on directly reaching consumers through a combination of digital marketing and more than 2,000 digitally-empowered licensed mortgage professionals. In our Partner strategy, we have established deep relationships with mortgage brokers, realtors, joint ventures with home builders, and other referral partners. These partnerships are valuable origination sources with lower customer acquisition costs. Our technology is a key component of the value proposition to these partner relationships, allowing us to integrate directly into our partners' native systems. We maintain integrated referral relationships with several leading brands, including a partnership with one of the 10 largest U.S. retail banks by total assets. During 2019, our Retail strategy produced 72% of our origination volume, with our Partner strategy representing the remaining 28%.

Our digital-first approach across our Retail and Partner strategies leverages the power of *mello*® to create a streamlined experience for consumers. Our predictive models route leads to the right loan officer at the right time to optimize the consumer's experience and best serve their needs. Based on each consumer's needs and preferences, leads are directed to in-house or in-market loan officers, team members at our centralized operations locations, or our digital self-service platform. Our in-market loan officers are able to leverage their long-term relationships as well as our proprietary *mello*® platform and loanDepot brand, driving improved profitability per loan officer.

*          *          *

Our national brand along with our expertise in digital marketing, big data and marketing analytics, not only drives new customer acquisition, but also maximizes retention and customer lifetime value. We leverage these capabilities to "recapture" existing customers for subsequent refinance and purchase transactions. ***Our recapture rates are among the highest in the industry—for the nine months ended September 30, 2020, our organic refinance consumer direct recapture rate was 61% highlighting the efficacy of our marketing efforts and the strength of our customer relationships. This compares to an industry average refinance recapture rate of only 18% for the three months ended September 30, 2020*** according to Black Knight Mortgage Monitor. In addition, we achieved an overall organic recapture rate of 47% for the nine months ended September 30, 2020. ***Our recapture originations have lower customer acquisition costs than originations to new customers, positively impacting our profit margins.***

***We have significantly increased our originations market share from 1.0% in 2014 to 2.6% for the first nine months of 2020, and our strong consumer brand and proprietary technology platform have positioned us to continue gaining additional share.*** Our Retail and Partner strategies have led to a balanced mix of purchase and refinance mortgages, with purchase originations representing 41% of total originations in 2019. We have a well-defined plan to accelerate this growth by expanding upon our technological and brand advantages, growing our market share in both purchase and refinance markets, and further increasing customer retention and lifetime value. Secular demographic and housing market tailwinds provide further support for our competitive advantages.

***Our platform and technology create a significant financial advantage.*** Our brand effectiveness and marketing capabilities optimize our customer acquisition costs, and our automation reduces unnecessary expenses throughout the origination process. We are able to scale quickly and efficiently which allows us to grow both transaction volume and profitability. During the COVID-19 pandemic, our technology platform and culture enabled us to hire, train and onboard over 3,500 new team members remotely. Our growth and profitability during the last nine months is further evidence of the scalability of our platform and validates the investments we have made in our brand and our technology. ***For the nine months ended September 30, 2020, we generated $63.4 billion in originations (116% year-over-year growth), $3.0 billion in revenue (227% year-over-year growth), $1,465.9 million in net income and $1,085.9 million in adjusted net income, making us one of the fastest-growing and most profitable companies in our industry.***

(Emphasis added.)

128.    The Prospectus touted the growth of LoanDepot as follows:

We have demonstrated our ability to grow our business and market share, having grown from a de novo start-up in 2010 to the second largest non-bank retail originator in the U.S. with a 2.6% share of a $11.0 trillion mortgage market as of September 30, 2020. We believe that we are well positioned to continue our market share growth through both our Retail strategy, where we have invested in our team members and technology to enable rapid scaling, and our Partner strategy, where independent brokers, in addition to joint venture and integrated referral partners, increasingly choose to work with us based on our reputation for excellent customer service and seamless user experiences. ***Our growth has accelerated in recent quarters as our long-term investments in brand marketing and innovative technology have helped us achieve industry-leading growth and profitability.***

(Emphasis added.)

129.    The Prospectus also included the following chart touting the growth in originations over the history of LoanDepot's existence:



130.     Furthermore, the Prospectus touted that such growth was likely to continue, stating as follows:

> We believe that *continuing to make these investments will allow us to grow market share, increase customer retention and deliver enhanced returns that will ultimately enable a virtuous cycle of further investment and returns.*

(Emphasis added.)

131.     The Prospectus also touted the Company's market share:

> We've created a company that is built to serve customers throughout the entire loan transaction, from the onset of the purchase or refinance decision through loan closing and servicing. *We now possess roughly 3% market share of annual mortgage origination volumes*, which makes up part of the $11T total addressable market. Thanks to our brand investment over time, we are also one of the most recognized brands in the industry today. *All of this gives us enormous runway.*

132.     The Prospectus touted the Company's year-over-year growth for the period ended September 30, 2020, stating as follows: "We originated $79.4 billion of loans for the twelve months ended September 30, 2020 and *experienced 116% year-over-year origination volume growth for the nine months ended September 30, 2020*." (Emphasis added.)

133.     The Prospectus also touted that the Company's investments in its brand created a

significant barrier to entry for competitors:

> We believe that we are one of only two non-banks with a nationally-recognized consumer brand in the U.S. retail mortgage origination industry. Since the Company's launch in 2010, we have invested over $1.2 billion in marketing and the promotion of our brand, and we believe there are significant barriers-to-entry in creating a brand comparable to ours.

134.    The Prospectus also touted the Company's superior ability to maximize customer retention and customer lifetime value, stating:

> ***Our recapture rates are among the highest in the industry***—for the nine months ended September 30, 2020, ***our organic refinance consumer direct recapture rate was 61% highlighting the efficacy of our marketing efforts and the strength of our customer relationships. This compares to an industry average refinance recapture rate of only 18%*** for the three months ended September 30, 2020 according to Black Knight Mortgage Monitor. In addition, we achieved an overall organic recapture rate of 47% for the nine months ended September 30, 2020. Our recapture originations have lower customer acquisition costs than originations to new customers, positively impacting our profit margins.

(Emphasis added.)

135.    The Prospectus also touted the Company's recent increase in origination market share and the purportedly significant financial advantage of the Company's platform and technology:

> ***We have significantly increased our originations market share from 1.0% in 2014 to 2.6% for the first nine months of 2020, and our strong consumer brand and proprietary technology platform have positioned us to continue gaining additional share.*** Our Retail and Partner strategies have led to a balanced mix of purchase and refinance mortgages, with purchase originations representing 41% of total originations in 2019. ***We have a well-defined plan to accelerate this growth*** by expanding upon our technological and brand advantages, growing our market share in both purchase and refinance markets, and further increasing customer retention and lifetime value. Secular demographic and housing market tailwinds provide further support for our competitive advantages.
>
> ***Our platform and technology create a significant financial advantage.*** Our brand effectiveness and marketing capabilities optimize our customer acquisition costs, and our automation reduces unnecessary expenses throughout the origination process. We are able to scale quickly and efficiently which allows us to grow both transaction volume and profitability. During the COVID-19 pandemic, our technology platform and culture enabled us to hire, train and onboard over 3,500 new team members remotely. Our growth and profitability during the last nine months is further evidence of the scalability of our platform and validates the

investments we have made in our brand and our technology. For the nine months ended September 30, 2020, we generated $63.4 billion in originations (116% year-over-year growth), $3.0 billion in revenue (227% year-over-year growth), $1,465.9 million in net income and $1,085.9 million in adjusted net income, making us one of the fastest-growing and most profitable companies in our industry.

(Emphasis added.)

136.    The Prospectus also contained a misleading statement purportedly disclosing that margins and revenues could be impacted in "future years," when in face the Company's margins and revenues were already being adversely affected and would be adversely affected in the very next quarter:

While the financial markets have demonstrated significant volatility due to the economic impacts of COVID-19, interest rates have fallen to historic lows resulting in increased mortgage refinance originations and favorable margins. Our efficient and scalable platform has enabled us to respond quickly to the increased market demand. Market demand in 2020 was driven by a prolonged period of historically low interest rates. This demand contributed to gain on sale margins reaching levels that the Company does not believe will be sustained *in future years and could result in decreases in revenue*.

137.    The statement referenced in ¶ 136 was materially false and misleading when made because margins and revenues were already being adversely affected in the current year, that is, 2021, and would continue to be affected in the very next quarter and in the same year.

138.    The Prospectus also included the following risk disclosure:

Our loan originations, particularly our refinance mortgage loan volume, are dependent on interest rates and are expected to decline if interest rates increase. Our loan origination activities are also subject to overall market factors that can impact our ability to grow our loan production volume. For example, increased competition from new and existing market participants, slow growth in the level of new home purchase activity or reductions in the overall level of refinancing activity can impact our ability to continue to grow our loan origination volume, and we may be forced to accept lower margins in order to continue to compete and keep our volume of activity consistent with past or projected levels.

139.    The Prospectus further touted the Company's success in increasing mortgage refinance originations and favorable margins, even during the COVID-19 pandemic:

While the financial markets have demonstrated significant volatility due to the economic impacts of COVID-19, interest rates have fallen to historic lows resulting

45

in increased mortgage refinance originations and favorable margins. Our efficient
and scalable platform has enabled us to respond quickly to the increased market
demand. We have highlighted below the key steps we have undertaken since the
onset of the pandemic to position our platform for continued success:

- Maintained higher liquidity levels from an increase in cash from retained earnings.
- Increased our total loan funding capacity with our current lending partners.
- Stepped up protocols related to verification of key metrics such as employment and income to ensure the highest quality underwriting standards are maintained.
- Transitioned our workforce to working remotely as of March 19, 2020.

140.    The statements referenced in ¶¶ 126–36 and 138–39 were materially false and misleading and omitted to state, *inter alia*, that: (1) LoanDepot had engaged in the Interest Overcharging and the Origination Conduct; (2) LoanDepot's refinance originations had declined significantly at the time of the IPO due to competition and industry saturation; (3) LoanDepot's gain-on-sale margins had declined substantially by the time of the IPO; (4) significantly lower growth and refinance originations had already forced the Company to embark on an expense reduction plan; (5) as a result of all the foregoing, the Company's revenue and growth would be negatively impacted; and (6) the Company failed to maintain adequate internal controls.

### Annual Report for the 2020 Fiscal Year

141.    On March 16, 2021, the Company filed its annual report on Form 10-K for the year ended December 31, 2020. The Company subsequently amended its annual report twice, filing a Form 10-K/A on March 26, 2021 and March 29, 2021. The initial filing and its two subsequent amendments were each signed by Defendants Hsieh, Flanagan, Carrillo, Dorman, Lepore, Golson, and Dodson, and contained certifications, signed by Defendants Hsieh and Flanagan pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The second amended annual report

for the year ended December 31, 2021, which was filed on March 29, 2021 and is herein referred

to as the 2020 10-K/A, substantially reiterated several of the false and misleading statements that

were issued in the Offering Documents.

142.    The 2020 10-K/A stated the following regarding the Company's business:

> We are a customer-centric, technology-empowered residential mortgage platform with a widely recognized consumer brand. We launched our business in 2010 to disrupt the legacy mortgage industry and make obtaining a mortgage a positive experience for consumers. We have built a leading technology platform, designed around the consumer that has redefined the mortgage process. Our digital-first approach has allowed us to become one of the fastest-growing, at-scale mortgage originators in the U.S.
>
> *             *             *
>
> Consumer-facing industries continue to be disrupted by technological innovation. The mortgage industry is no different with consumers expecting increased levels of convenience and speed. ***The residential mortgage market in the U.S. is massive— with approximately $11.1 trillion of mortgages outstanding as of December 31, 2020and is largely served by legacy mortgage originators, which require consumers to navigate time-consuming and paper-based processes to apply for and obtain mortgage loans. mello®, our proprietary end-to-end technology platform, combined with our differentiated data analytics capabilities and nationally recognized consumer brand, uniquely positions us to capitalize on the ongoing shift towards at-scale, digitally-enabled platforms.***
>
> ***Our innovative culture and contemporary consumer brand represent key differentiators for loanDepot.*** We have fostered an entrepreneurial mindset and relentlessly deliver an exceptional experience to our customers. Our guiding principle is to delight our customers by exceeding their expectations. Since the Company's launch in 2010, we have invested over $1.3 billion in marketing and the promotion of our brand, and we believe there are significant barriers-to-entry in creating a brand comparable to ours. *mello®* drives streamlined customer experiences and operational efficiency throughout the entire lifecycle of a mortgage loan, including fully digital capabilities for customer acquisition, application, processing, and servicing. Our front-end interface is intuitive and user-friendly, driving high customer engagement and lower acquisition costs. *mello®* also powers our back-end technology, automating and streamlining numerous functions for our customers, team members and partners.

(Emphasis added.)

143.    The 2020 10-K/A also stated the following regarding the Company's marketing

strategy:

*Our national brand along with our expertise in digital marketing, big data, and marketing analytics, not only drives new customer acquisition, but also maximizes retention and customer lifetime value. We leverage these capabilities to "recapture" existing customers for subsequent refinance and purchase transactions. Our recapture rates are among the highest in the industry. Our organic refinance consumer direct recapture rate for the year ended December 31, 2020 was 63%—highlighting the efficacy of our marketing efforts and the strength of our customer relationships.* We define organic refinance consumer direct recapture rate as the total UPB of loans in our servicing book that are paid in full for purposes of refinancing the loan on the same property, with the Company acting as lender on both the existing and new loan, divided by the UPB of loans in our servicing book that paid in full for the purpose of refinancing the loan on the same property. This compares to an industry average retention rate of only 18% for the quarter ended December 31, 2020 according to Black Knight's January 2021 Mortgage Monitor. The terms "recapture" and "retention" can be used synonymously by industry participants. *In addition, we achieved an overall organic recapture rate of 57% for the year ended December 31, 2020.* Our recapture originations have lower customer acquisition costs than originations to new customers, positively impacting our profit margins.

We engage in multiple targeted direct marketing strategies among our Retail and Partner strategies enhancing our customer acquisition effectiveness. We utilize online lead aggregators to acquire quality customer leads in bulk at attractive prices. Our organic digital marketing approach employ various digital strategies such as SEO, pay-per-click, banner advertising and organic content to generate organic online leads. We employ targeted direct marketing strategies including direct mailing to broaden our reach of consumers. In situations where we have an existing customer relationship, we use data-driven marketing campaigns to generate new business from customers in our servicing portfolio. We are also able to leverage our mortgage professionals' and partners' existing and newly-developed relationships with customers and referral partners to generate origination volume.

(Emphasis added.)

144.    The 2020 10-K/A also touted the Company's increase in originations market share

for the period stretching through 2020:

We believe we compete favorably on the basis of our proprietary technology, diversified customer acquisition model and origination channels, scale, brand, and broad suite of products. *We have significantly increased our originations market share from 1.0% in 2014 to 2.7% for the year ended December 31, 2020 and our strong consumer brand and proprietary technology platform have positioned us to continue gaining additional share.*

(Emphasis added.)

145.    The 2020 10-K/A also contained the following statement warning that the Company

*may* not be able to continue growing the volume of its loan originations:

> Our loan originations, particularly our refinance mortgage loan volume, are dependent on interest rates and are expected to decline if interest rates increase. Our loan origination activities are also subject to overall market factors that can impact our ability to grow our loan production volume. For example, increased competition from new and existing market participants, slow growth in the level of new home purchase activity or reductions in the overall level of refinancing activity can impact our ability to continue to grow our loan origination volume, and we may be forced to accept lower margins in order to continue to compete and keep our volume of activity consistent with past or projected levels.

146.   The statement referenced in ¶ 145 was materially false and misleading because the Company was already experiencing increased competition that was having a negative impact on margins.

147.   Furthermore, the 2020 10-K/A touted the Company's success, even during the COVID-19 Pandemic:

> While the financial markets have demonstrated significant volatility due to the economic impacts of COVID-19, interest rates have fallen to historic lows resulting in increased mortgage refinance originations and favorable margins. Our efficient and scalable platform has enabled us to respond quickly to the increased market demand. We have highlighted below the key steps we have undertaken since the onset of the pandemic to position our platform for continued success:

> - Maintained higher liquidity levels from an increase in cash from retained earnings.
> - Increased our total loan funding capacity with our current lending partners.
> - Stepped up protocols related to verification of key metrics such as employment and income to ensure the highest quality underwriting standards are maintained.
> - Transitioned our workforce to working remotely as of March 19, 2020.

148.   The statements referenced in ¶¶ 142–45 and 147 were materially false and misleading and omitted to state, *inter alia*, that: (1) LoanDepot had engaged in the Interest Overcharging and the Origination Conduct; (2) LoanDepot's refinance originations had declined significantly at the time of the IPO due to competition and industry saturation; (3) LoanDepot's gain-on-sale margins had declined substantially by the time of the IPO; (4) significantly lower growth and refinance originations had already forced the Company to embark on an expense

reduction plan; (5) as a result of all the foregoing, the Company's revenue and growth would be

negatively impacted; and (6) the Company failed to maintain adequate internal controls.

### May 10, 2021 Form 10-Q

149.     On May 10, 2021, the Company filed with the SEC its quarterly report on Form 10-

Q for the quarterly period ended March 31, 2021 (the "1Q21 10-Q"). The 1Q21 10-Q was signed

by Defendants Hsieh and Flanagan and contained SOX certifications signed by Defendants Hsieh

and Flanagan attesting to the accuracy of the financial statements contained in the 1Q21 10-Q, the

disclosure of any material changes to the Company's internal controls, and the disclosure of any

fraud committed by the Company, its officers, or its directors.

150.     The 1Q21 10-Q stated that "[t]here have been no material changes or updates to the

risk factors that were previously disclosed in Part I. 'Item 1A. Risk Factors' of our 2020 Form 10-

K filed with the SEC on March 16, 2021." By this statement in the 1Q21 10-Q, the Company

represented that the risk factors enumerated in the 2020 10-K/A were still applicable. Thus, the

1Q21 10-Q effectively reiterated the following false and misleading statement from the 2020 10-

K/A concerning the Company's loan originations:

> Our loan originations, particularly our refinance mortgage loan volume, are
> dependent on interest rates and are expected to decline if interest rates increase. Our
> loan origination activities are also subject to overall market factors that can impact
> our ability to grow our loan production volume. For example, increased competition
> from new and existing market participants, slow growth in the level of new home
> purchase activity or reductions in the overall level of refinancing activity can
> impact our ability to continue to grow our loan origination volume, and we may be
> forced to accept lower margins in order to continue to compete and keep our volume
> of activity consistent with past or projected levels.

151.     The statement referenced in ¶ 150 was materially false and misleading because the

Company was already experiencing increased competition that was having a negative impact on

margins.

152.     The 1Q21 10-Q was materially false and misleading and failed to disclose material

facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants represented that there had been no material changes or updates to the risk factors identified in the 2020 10-K, as amended, when in fact the 2020 10-K and its amendments were false and misleading for the reasons discussed in ¶ 148.

153.    The 1Q21 10-Q also failed to disclose that: (1) LoanDepot had engaged in the Interest Overcharging and the Origination Conduct; (2) LoanDepot's refinance originations had declined significantly at the time of the IPO due to competition and industry saturation; (3) LoanDepot's gain-on-sale margins had declined substantially by the time of the IPO; (4) significantly lower growth and refinance originations had already forced the Company to embark on an expense reduction plan; (5) as a result of all the foregoing, the Company's revenue and growth would be negatively impacted; and (6) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

154.    On August 3, 2021, the Company announced financial results for the second quarter of 2021. The Company reported non-GAAP earnings per share ("EPS") of $0.18, missing expectations by $0.34, and GAAP EPS of $0.07, missing expectations by $0.43. The Company also reported revenues of $779.9 million, missing expectations by $166.77 million and representing a year-over-year decline of 32.8%.

155.    Also on August 3, 2021, the Company hosted a conference call to discuss the Company's earnings for the second quarter of 2021. During the conference call, Defendant Hsieh stated that everything about the Company's business was "highly predictable." Specifically, he stated that "this is certainly not our first rodeo. ***Everything here is highly predictable. There's***

*been very, very little surprise.*" (Emphasis added.)

156.    By the close of trading on August 17, 2021, the price per share of the Company's Class A common stock had declined to $8.07, a loss of approximately 42% from the IPO price of $14.00.

### Repurchases

157.    During the Relevant Period, certain of the Individual Defendants caused the Company to initiate repurchases of its Class C common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $37 million to repurchase approximately 2,699,981 shares of its own Class C common stock at artificially inflated prices.

158.    According to a Form 4 filed by Defendant Hsieh on February 22, 2021, the Company used proceeds from the IPO and cash on hand to repurchase from continuing members of LD Holdings certain Class A common units of LD Holdings, together with a corresponding number of shares of the Company's Class C common stock, at a price per share equal to the IPO price of $14 per share. Defendant Hsieh's Form 4 discloses that the Company repurchased 2,699,981 shares of its Class C common stock from members of LD Holdings on February 19, 2021. Defendant Hsieh held voting and investment power over these shares.

159.    As the Company's stock was actually worth only $8.07 per share, the price at closing on August 17, 2021, the Company overpaid by approximately $16,010,887 for repurchases of its own Class C common stock on February 19, 2021.

### DAMAGES TO LDI

160.    As a direct and proximate result of the Individual Defendants' conduct, LDI will lose and expend many millions of dollars.

161.    Such expenditures include, but are not limited to, the costs, legal fees, arbitration

fees, and/or other fees associated with the Securities Class Actions filed against the Company and the Individual Defendants, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

162.    Such expenditures include, but are not limited to, unjust compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

163.    Such losses also include, but are not limited to, the more than $16 million which the Individual Defendants caused the Company to overpay to repurchase its own common stock during the Relevant Period when the Company's common stock was trading at artificially inflated prices due to the false and misleading statements at issue.

164.    As a direct and proximate result of the Individual Defendants' conduct, LDI has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

165.    Plaintiff brings this action derivatively and for the benefit of LDI to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of LDI, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, as well as the aiding and abetting thereof.

166.    LDI is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

167.    Plaintiff is, and has been at all relevant times, a shareholder of LDI. Plaintiff will

adequately and fairly represent the interests of LDI in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

168.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

169.    A pre-suit demand on the Board of LDI is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following seven individuals: Defendants Hsieh, Dodson, Dorman, Golson, and Lepore (the "Director-Defendants"), and non-parties Mike Linton ("Linton") and Pamela Hughes Patenaude ("Patenaude") (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time of the filing of this complaint.

170.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

171.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not

disinterested, and demand upon them is futile, and thus excused.

172.    Additional reasons that demand on Defendant Hsieh is futile follow. Defendant Hsieh founded LDLLC in 2009 and has served as its Chairman and CEO since that time. In addition, he has served as the Company's Chairman and CEO since its formation in November 2020. Thus, as the Company admits, Defendant Hsieh is a non-independent director. The Company provides Defendant Hsieh with his principal occupation, for which he receives handsome compensation, including a base salary of $850,000, a bonus of $7.5 million for the 2020 Fiscal Year, and other bonuses for the 2020 Fiscal Year totaling $42.5 million. In addition, as of March 12, 2021, Defendant Hsieh beneficially owned 61.1% of the Company's total voting power, making him a majority controlling shareholder. This controlling position, in addition to his position as CEO of the Company and of LDLLC, gives Defendant Hsieh significant and decisive power to control the Company's affairs. He directed and ordered the Origination Conduct, which had the effect of artificially inflating the price of the Company's stock in the IPO and during the Relevant Period. Defendant Hsieh was motivated to inflate the public perception of the Company's business, operations, and prospects because he stood to receive millions of dollars as a result of the IPO. It was therefore to his benefit to represent the Company as occupying a stronger financial condition than was true. Indeed, according to the Form 4 he filed on February 22, 2021, the Company repurchased nearly 2.76 million shares of Class C common stock (together with a corresponding number of units of LD Holdings) at a price of $14 per share from entities affiliated with Defendant Hsieh, and Defendant Hsieh held voting and investment power over those shares. Thus, due to the millions of dollars he gained through the IPO, Defendant Hsieh cannot independently and disinterestedly investigate the allegations herein. Richards alleges in the California Complaint that Defendant Hsieh may have or did in fact engage in illegal conduct in an effort to artificially inflate

the Company's financial performance prior to the IPO. Moreover, as LDLLC's and the Company's highest officer and/or controlling shareholder, Defendant Hsieh had ultimate responsibility for the false and misleading statements issued in connection with the IPO and during the Relevant Period. Thus, Defendant Hsieh is a primary wrongdoer in the misconduct alleged in this verified shareholder derivative complaint, in addition to his role as an alleged primary wrongdoer in the allegations of the Richards complaint, which are related to the false and misleading statements and omissions alleged to be actionable in this case. Despite his position as the highest officer of LDLLC and the Company, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements. In addition, he consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Hsieh signed, and thus personally made, the false and misleading statements in the Registration Statement, the 2020 10-K, and the 1Q21 10-Q. Moreover, Defendant Hsieh is a defendant in the Securities Class Actions. For these reasons, Defendant Hsieh breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173.    Additional reasons that demand on Defendant Dodson is futile follow. Defendant Dodson was appointed to serve as a director of LDLLC in December 2009 and has served as a director of the Company since the IPO. Defendant Dodson has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Dodson serves as Managing Partner at Parthenon Capital, which held 38.5% of the Company's total voting power as of March 12, 2021. As a trusted director of LDLLC and the Company, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements. In addition, he consciously disregarded his duties to monitor such controls over reporting and

engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Dodson signed, and thus personally made, the false and misleading statements in the 2020 10-K/A. Moreover, Defendant Dodson is a defendant in the Securities Class Actions. For these reasons, Defendant Dodson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174.    Additional reasons that demand on Defendant Dorman is futile follow. Defendant Dorman was appointed to serve as a director of LDLLC in July 2015 and has served as a Company director since the IPO. He currently serves as Chair of the Audit Committee and as a member of the Compensation Committee and the Governance and Nominating Committee. Defendant Dorman has received and continues to receive compensation for his role as a director as described above. As a trusted director of LDLLC and the Company, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements. In addition, he consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Dorman signed, and thus personally made, the false and misleading statements in the 2020 10-K/A. Moreover, Defendant Dorman is a defendant in the Securities Class Actions. For these reasons, Defendant Dorman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

175.    Additional reasons that demand on Defendant Golson is futile follow. Defendant Golson was appointed to serve as a director of LDLLC in December 2009 and has served as a Company director since the IPO. Defendant Golson received and continues to receive compensation for his role as a director as described above. In addition, Defendant Golson serves

as Co-CEO and a Managing Partner at Parthenon Capital, which held 38.5% of the Company's total voting power as of March 12, 2021. As a trusted director of LDLLC and the Company, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements. In addition, he consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Golson signed, and thus personally made, the false and misleading statements in the 2020 10-K/A.  Moreover, Defendant Golson is a defendant in the Securities Class Actions. For these reasons, Defendant Golson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

176.    Additional reasons that demand on Defendant Lepore is futile follow. Defendant Lepore was appointed to serve as a director of LDLLC in July 2015 and has served as a Company director since the IPO. She currently serves as Chair of the Compensation Committee, Chair of the Governance and Nominating Committee, and as a member of the Audit Committee. Defendant Lepore has received and continues to receive compensation for her role as a director as described above. As a trusted director of LDLLC and the Company, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements. In addition, she consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Lepore signed, and thus personally made, the false and misleading statements in the 2020 10-K/A. Moreover, Defendant Lepore is a defendant in the Securities Class Actions. For these reasons, Defendant Lepore breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

177.    Additional reasons that demand on the Board is futile follow.

178.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. In particular, Defendants Dodson and Golson have served as directors of LDLLC since 2009, the year in which when Defendant Hsieh founded LDLLC. In addition, Defendants Dodson and Golson have both worked at Parthenon Capital since 2005, and both are now Managing Partners at Parthenon Capital. Furthermore, Defendants Dorman and Lepore have served as directors of LDLLC since 2015, meaning that all five Director-Defendants have served together at LoanDepot for approximately seven years. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

179.    Three of the Director-Defendants stood to substantially gain from the IPO. For instance, according to a Form 4 filed on February 18, 2021, Defendant Hsieh indirectly received more than $37.7 million as a result of the Company's repurchases in connection with the IPO. Specifically, the Company used IPO proceeds and other cash on hand to repurchase certain shares of Class C common stock held by entities Defendant Hsieh controlled, along with a corresponding number of shares of Class A common stock, resulting in a more than $37.7 million windfall to entities affiliated with Defendant Hsieh. In addition, as Managing Members and/or Co-CEO of Parthenon Capital, Defendants Dodson and Golson stood to gain from the IPO. According to the Prospectus, the Parthenon Stockholders received net proceeds of approximately $22 million in the IPO. The precise benefits awarded to Defendants Dodson and Golson by Parthenon Capital and its affiliates as a result of the consummation of the IPO and the proceeds to the Parthenon

Stockholders are not publicly disclosed. However, Defendants Dodson and Golson served as Managing Members and/or Co-CEO of Parthenon Capital. Upon information and belief, they stood to gain significant prestige, compensation, and proceeds as a result of the funds received by Parthenon Stockholders as a result of the IPO.

180.   Defendants Dorman (as Chair), Dodson, and Lepore (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period.[1] Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the systems of internal accounting and financial controls, and the performance of the Company's independent auditor and internal audit function. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the systems of internal accounting and financial controls, and the performance of the Company's internal audit function, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

181.   Demand in this case is further excused because the Directors are beholden to and controlled by Defendant Hsieh and by the Parthenon Stockholders. Specifically, Defendant Hsieh held 61.1% of the Company's voting power as of March 12, 2021, and the Parthenon Stockholders held 38.5% of the Company's voting power as of March 12, 2021. Together, these holdings amount to 99.6% of the Company's voting power. As noted above, Defendants Dodson and Golson are

---

[1] Non-party Patenaude was appointed to serve on the Audit Committee effective July 28, 2021, six days prior to the conclusion of the Relevant Period.

both Managing Members of Parthenon Capital, with Defendant Golson also serving as Parthenon Capital's Co-CEO. In light of this, the Directors cannot impartially consider a demand against Defendants Hsieh, Dodson, and Golson, who are interested, primary wrongdoers, as they are dependent on each of these Director-Defendants, individually and collectively, for their continued employment with the Company and the lucrative compensation that goes with that. This is particularly true with respect to the Directors' ability to consider a demand against Defendant Hsieh, as he alone controls more than 61% of the Company. As a result of the substantial control over Company by Defendant Hsieh and the Parthenon Stockholders, the latter of which are controlled by and/or affiliated with Defendants Dodson and Golson, the Directors are unable to evaluate a demand against Defendants Dodson, Golson, or Hsieh.

182.   In violation of the Code and the Company's corporate governance documents, the Director-Defendants conducted little, if any, oversight of the Individual Defendants' scheme to cause the Company to make false and misleading statements, and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code and other corporate governance documents, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

183.   LDI has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for LDI any part

of the damages LDI suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

184.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

185.     The acts complained of herein constitute violations of fiduciary duties owed by LDI's officers and directors, and these acts are incapable of ratification.

186.     The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of LDI. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue certain of the Director-Defendants or certain of the officers of LDI, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the

Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

187.     If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause LDI to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

188.     Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against the Individual Defendants for Breach of Fiduciary Duties**

189.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

190.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of LDI's business and affairs.

191.     Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

192.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of LDI.

193.     In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

194.     In breach of their fiduciary duties owed to LDI, the Individual Defendants willfully

or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*: (1) LoanDepot had engaged in the Interest Overcharging and the Origination Conduct; (2) LoanDepot's refinance originations had declined significantly at the time of the IPO due to competition and industry saturation; (3) LoanDepot's gain-on-sale margins had declined substantially by the time of the IPO; (4) significantly lower growth and refinance originations had already forced the Company to embark on an expense reduction plan; (5) as a result of all the foregoing, the Company's revenue and growth would be negatively impacted; and (6) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

195.    In further breach of their fiduciary duties, and throughout the Relevant Period, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact.

196.    In yet further breach of their fiduciary duties, during the Relevant Period, one of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $164,959, while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein. In addition, in breach of their fiduciary duties, the Individual Defendants caused the Company to repurchase approximately 2,699,981 shares of its own Class C common stock on February 19, 2021 for approximately $37,799,846. Given that, during this time, the Company's stock was only worth $8.07 per share, the price at close on August 17, 2021, the Company overpaid by over $16 million.

197.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to

maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of LDI's securities.

198.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

199.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, LDI has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

200.    Plaintiff on behalf of LDI has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Unjust Enrichment

201.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

202.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, LDI.

203.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from LDI that was tied to the performance or artificially inflated valuation of LDI, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

204.    Plaintiff, as a shareholder and a representative of LDI, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

205.    Plaintiff on behalf of LDI has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Abuse of Control

206.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

207.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence LDI, for which they are legally responsible.

208.    As a direct and proximate result of the Individual Defendants' abuse of control, LDI has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, LDI has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

209.    Plaintiff on behalf of LDI has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

210.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

211.    By their actions alleged herein, the Individual Defendants, either directly or through

aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of LDI in a manner consistent with the operations of a publicly-held corporation.

212.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, LDI has sustained and will continue to sustain significant damages.

213.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

214.    Plaintiff on behalf of LDI has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

215.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

216.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

217.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

218.    Plaintiff on behalf of LDI has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Violations of
### Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

219.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

220.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding LDI. Not only is LDI now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon LDI by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase nearly 2.7 million shares of its Class C common stock at the artificially inflated price of $14 per share, damaging LDI.

221.    The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's Offering Documents, quarterly and annual reports, press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

222.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about LDI not misleading.

223.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated

by LDI.

224.    The Individual Defendants acted with scienter, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

225.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive, director, and/or controlling shareholder of the Company, they made and/or signed the Company's Form 10-K and its amendments, which were filed with the SEC during the Relevant Period.

226.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

227.    Plaintiff on behalf of LDI has no adequate remedy at law.

## SEVENTH CLAIM

**Against Individual Defendants for Violations of Section 20(a)
of the Securities Exchange Act of 1934**

228.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

229.    The Individual Defendants, by virtue of their positions with LDI and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of LDI and each of its officers and directors who made the false and misleading statements alleged herein within the

meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause LDI and the other Individual Defendants to engage in the illegal conduct and practices complained of herein and violate § 10(b) of the Exchange Act.

230.    Plaintiff on behalf of LDI has no adequate remedy at law.

## EIGHTH CLAIM

**Against the Individual Defendants for Contribution**
**Under Section 11(f) of the Securities Act and 21D of the Exchange Act**

231.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

232.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Actions brought on behalf of LDI shareholders, in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

233.    Federal law provides LDI with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

234.    The plaintiffs in the Securities Class Actions allege that the Offering Documents contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing proper preparation.

235.    LDI is the registrant for the IPO. The Individual Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

236.    As issuer of the shares, LDI is strictly liable to the class action plaintiffs and the class for the misstatements and omissions alleged in the Securities Class Actions.

237.    The plaintiffs in the Securities Class Actions allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that

the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

238.    The Individual Defendants, because of their positions of control and authority as officers and directors of LDI, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of LDI, including the wrongful acts complained of herein and in the Securities Class Actions.

239.    Accordingly, the Individual Defendants are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

240.    As such, LDI is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of LDI, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to LDI;

(c)    Determining and awarding to LDI the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing LDI and the Individual Defendants to take all necessary actions

to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect LDI and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2.  a provision to permit the shareholders of LDI to nominate at least four candidates for election to the board; and

      3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding LDI restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: March 11, 2022

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

*Attorneys for Plaintiff*